## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GERSON CARNALLA-RUIZ, (M07113),

      Petitioner,

v.

DR. DEANNA BROOKHART,[1]

      Respondent.

Case No. 21 C 5527

Hon. LaShonda A. Hunt

## MEMORANDUM OPINION AND ORDER

Petitioner Gerson Carnalla-Ruiz, a state prisoner convicted of three counts of predatory criminal sexual assault of a child, brings this *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. 4). For the reasons discussed below, the petition is denied, and the Court declines to issue a certificate of appealability.

## BACKGROUND

The relevant facts are drawn from the state court record (Dkt. 41) and the state appellate court opinion (Dkt. 41-4) and are presumed to be correct. 28 U.S.C. § 2254(e)(1). In 2005, Petitioner was married to Victoria Uribe and the couple had one son and one daughter, D.R. *People v. Carnalla-Ruiz*, 2013 IL App (1st) 092302-U, ¶ 7 (Dkt. 41-4). D.R. was born with spina bifida and scoliosis; as a result, she is confined to a wheelchair, has a lower sensitivity to feeling below her chest, and must be catheterized every four hours to remove urine from her bladder. *Id.* at ¶¶ 7, 10. Prior to sixth grade, D.R. was unable to catheterize herself and relied on her mother, Uribe, to

---

[1] Petitioner is currently incarcerated at Big Muddy River Correctional Center, where the warden is Christel Crow. The Clerk is directed, forthwith, to substitute Dr. Deanna Brookhart for Christel Crow as the Respondent in this case pursuant to Fed. R. Civ. P. 25(d).

do so. *Id.* at ¶¶ 7, 11. Prior to catheterization, D.R.'s genital area needed to be cleaned, and lubricant needed to be applied. *Id.* at ¶ 7.

In May 2005, Uribe visited Mexico after her father's death, and while she was gone, Petitioner was responsible for catheterizing D.R. *Id.* at ¶¶ 8, 11. According to D.R., one time, Petitioner kissed her vagina two or three times after catheterizing her. *Id.* at ¶ 11. While she could not feel Petitioner's lips "very much" and could not tell if he was putting his tongue inside of her, she was able to see what he was doing by way of a closet mirror and demanded that he stop. *Id.* at ¶¶ 11, 14. On another occasion, Petitioner took his penis out of his shorts, rubbed lubricant on it, squeezed it, and "white stuff" came out. *Id.* at ¶ 12. D.R. told Petitioner that she did not "want to see it." *Id.* Still another time, Petitioner slept in bed with D.R. following a surgery D.R. had undergone for a spinal infection. *Id.* at ¶ 13. D.R. woke up and saw Petitioner trying to remove her diaper and insert his penis into her vagina, but she stopped Petitioner before his penis could touch her. *Id.*

In addition to the incidents in the family's home described above, D.R. testified about an incident that occurred in the garage where Petitioner worked in Addison, Illinois. *Id.* at ¶ 15. Specifically, D.R. was at the garage with her brother and Petitioner when Petitioner asked his son to leave so he could catheterize D.R. *Id.* After he catheterized her, Petitioner tried to put his penis, which had "white stuff" on it, into D.R.'s vagina. *Id.* While D.R. could not feel it, she could see that his penis made contact with the "top" of her vagina. *Id.* D.R. did not tell her mother or anyone else what Petitioner had done because she was scared. *Id.*

When Uribe returned home in August 2005, she noticed a change in D.R.'s behavior, specifically that D.R. appeared sad and spent a lot of time sleeping. *Id.* at ¶ 8. In August 2006, D.R. told Uribe that Petitioner had tried to sleep with her and kissed her intimate parts four times

and had exposed his penis to her while he was catheterizing her, but she did not tell Uribe everything that had happened. *Id.* at ¶¶ 9, 16. After hearing this, Uribe contacted D.R's school's social worker, Nancy Rock, who later spoke with D.R. at school. *Id.* at ¶¶ 9, 16.

D.R. told Rock that Petitioner kissed her vagina and tried to put his penis in her vagina. *Id.* at ¶ 16. After speaking with Rock, the police came to D.R.'s school, and she then spoke with Bonnie Brunette. *Id.* Brunette worked for the Children's Advocacy Center, a non-profit organization that assists in investigating cases of child abuse and neglect, which includes conducting forensic interviews of children who allege physical or sexual abuse. *Id.* at ¶ 18. Brunette conducted an in-depth interview with D.R., during which D.R. provided a detailed recitation of what had occurred. *Id.* at ¶¶ 17, 19-23.

Des Plaines police detectives testified that on August 29, 2006, Petitioner was arrested, taken to the police station, informed that he was under arrest, and read his *Miranda* rights, which Petitioner waived. *Id.* at ¶¶ 24-25. According to Detective Matt Kulak, Petitioner made a 20-30 minute oral statement in which he "confessed that while his wife was away, he became sexually aroused when catheterizing his daughter and kissed her vagina and rubbed himself." *Id.* at ¶ 25. Petitioner was then interviewed by an assistant state's attorney (ASA), prior to which he again received a *Miranda* warning. *Id.* at ¶ 26. Nevertheless, this time Petitioner provided a signed written statement which included more detail than his oral statement to Detective Kulak. *Id.* According to Detective Kulak, Petitioner specifically asked the ASA to include in the statement that he was "explaining the purpose of sex, marriage, and relationships" to D.R. during each sexual encounter. *Id.*

During Petitioner's trial, the ASA testified about his interview of Petitioner, during which he "waived his Miranda rights and confessed to sexually abusing his daughter." *Id.* at ¶ 28.

3

Petitioner's written, signed statement was admitted into evidence and read to the jury. *Id.* It detailed Petitioner's version of events, which was somewhat consistent with what D.R. had reported, at least in terms of the sexual acts that had occurred. *Id.* at ¶¶ 29-31. Additional testimony was elicited from Dr. Ruby Roy, a pediatrician and child sexual abuse expert who examined D.R. in early December 2006, and Rock, the school social worker. *Id.* at ¶ 27, 33.

On Petitioner's behalf, testimony was elicited from Mary O'Looney, who provided home health care for D.R. in 2008 following surgery and testified that she "never observed anything unusual between [Petitioner] and D.R." during her home visits. *Id.* at ¶ 32. Petitioner also testified on his own behalf, claiming that he kissed D.R.'s vagina only once, and that it was his "reaction" to his concern that she may have lost consciousness. *Id.* at ¶¶ 34-35. He also claimed that D.R. must have seen his penis when he was urinating "in her pull-up so that he would not have to get up and go to the bathroom." *Id.* at ¶ 36.

Petitioner testified that upon his arrest, he requested a lawyer and was told that once he gave a written statement, he could go home. *Id.* at ¶ 37. The ASA asked Petitioner questions and wrote out the statement, but Petitioner claimed that he disagreed with much of what was written and identified certain parts of the statement to be "voided." *Id.* Despite signing all pages of the statement and a *Miranda* waiver, Petitioner claimed that he never received *Miranda* warnings and denied that he ever told detectives he "licked, or inserted his tongue into D.R.'s vagina, that he masturbated and ejaculated in front of her or . . . attempted to put his penis in D.R.'s vagina." *Id.* at ¶ 38.

### A.    <u>Trial Court Proceedings</u>

Petitioner's trial was molded by pre-trial motion practice. First, Petitioner moved to suppress his custodial statement, arguing that he (1) was not informed of his rights; (2) did not

knowingly waive his rights; (3) was interrogated after requesting counsel; and (4) was coerced. *Id.* at ¶ 4. Upon hearing testimony from Petitioner and three police officers, the trial court denied Petitioner's motion. *Id.* Second, the State moved to allow hearsay statements made by D.R. to her mother, a school social worker, and detectives from the Children's Advocacy Center. *Id.* at ¶ 5. Finding D.R.'s statements sufficiently reliable, the Court granted the State's motion and rendered the statements admissible as substantive evidence pursuant to 725 ILCS 5/115-10. *Id.* Finally, the State moved for leave to present other crimes evidence under 725 ILCS 5/115-7.3, specifically regarding an instance of uncharged conduct in which Petitioner allegedly engaged in penis-vagina contact with D.R.[2] *Id.* at ¶ 6. The State argued that this alleged activity served as propensity evidence because it occurred within weeks of the charged offenses, was factually similar to the charged offenses, was supported by Petitioner's confession, and was admissible under common law to show criminal intent, motive, state of mind, and *modus operandi*. *Id.* Petitioner moved in limine to exclude evidence of other crimes, which the Court denied. *Id.* The evidence was thus deemed admissible. *Id.*

The jury found Petitioner guilty of three counts of predatory criminal sexual assault of a child,[3] and he was sentenced to a total of 40 years in prison. *Id.* at ¶¶ 2, 39.

## B.    <u>Direct Appeal</u>

Petitioner appealed, arguing in pertinent part, "(1) the State failed to prove the *corpus delicti* of two of the three counts of predatory criminal sexual assault of a child; (2) the trial court improperly admitted other crimes evidence; [and] (3) trial counsel was ineffective[.]" *People v.*

---

[2] This incident was not charged in this case because it allegedly occurred outside of the state court's jurisdiction.

[3] Predatory criminal sexual assault of a child is codified at 720 ILCS 5/11-1.40 and was formerly cited as 720 ILCS 5/12-14.1.

*Carnalla-Ruiz*, 2013 IL App (1st) 092302-U, ¶ 2. As to his ineffective assistance of counsel claim, Petitioner argued that his counsel was ineffective based on a question counsel asked Dr. Roy during cross-examination and that, more specifically, "counsel's distasteful remark reflected badly on him." *Id.* at ¶ 75. The appellate court affirmed. *Id.* at ¶ 1.

Petitioner then filed a *pro se* petition for leave to appeal (PLA), in which he raised issues regarding, among other things, *corpus delicti*, the introduction of evidence regarding the incident in the Petitioner's garage in Addison, and ineffective assistance of counsel. (State Ct. R., Ex. E, Dkt. 41-5). As to his ineffective assistance claims, Petitioner did not claim that trial counsel was ineffective due to his cross-examination of Dr. Roy. (*Id.*). The Illinois Supreme Court denied his PLA. (State Ct. R., Ex. F, Dkt. 41-6). Subsequently, the United States Supreme Court denied Petitioner's petition for writ of certiorari. (State Ct. R., Ex. G, Dkt. 41-7).

### C.    Post-Conviction Proceedings

Petitioner filed a *pro se* petition for postconviction relief, contending that his trial counsel was ineffective for failing to (1) "call his son . . . to testify about police abuse and coercion allegedly committed against [Petitioner's son], to support [P]etitioner's claim that the police coerced him into confessing and providing a signed statement following his arrest[;]" (2) "argue his constitutional rights were violated during the questioning of D.R.;" (3) "call witnesses regarding a previous Department of Children and Family Services . . . investigation of alleged abuse of [Petitioner's son] that resulted in an unsubstantiated finding;" (4) "contest a search of his vehicle;" (5) "consider his pretrial request to prove that D.R.'s statements following her victim sensitive interviews . . . were the products of coercive methods[;]" (6) raise issues of coercion, concealment of exculpatory evidence by the state, erroneous jury instructions, and violation of Petitioner's constitutional right to confront D.R.[;]" and (7) "make additional arguments contesting

6

the sufficiency of the evidence for count II." *People v. Carnalla-Ruiz*, 2023 IL App (1st) 201183, at ¶ 7. The State moved to dismiss Petitioner's postconviction petition, and the circuit court granted the State's motion. *Id.* at ¶¶ 16, 20. Petitioner appealed, arguing only that "postconviction counsel provided unreasonable assistance by failing to make a concerted effort to contact [Petitioner's son], 'overlooking the sworn and notarized version of [Petitioner's son's] statement,' and only providing a conclusory argument in response to contest the State's motion to dismiss." *Id.* at ¶¶ 21, 23. The appellate court affirmed. *Id.* at ¶¶ 2, 45.

His final attempt to obtain relief in the state court, Petitioner filed another *pro se* PLA.[4] (State Ct. R., Ex. L, Dkt. 41-12). In that PLA, Petitioner made general claims about: his health and other grievances against the Illinois Department of Corrections (IDOC); biases people hold against individuals accused of committing the offenses he was charged with; the legal effect of his "affidavit of correction;" the court disregarding the plain language of the statute at issue; the trial court misstating the law to the jury; the court invading his daughter's privacy and injuring her dignity; Dr. Roy's medical report, specifically that her statements were speculative and exceeded the scope of her specialty; the interpretation and application of the *corpus delicti* doctrine leading to extreme and absurd results in violation of due process; state infringement on his parental rights and responsibilities; his lack of receipt of his transcripts; the ASA convincing Petitioner's retained attorney not to take his case; jury impartiality; and ineffective assistance of counsel. (*Id.*). With respect to his ineffective assistance claims, Petitioner claimed that his appointed postconviction counsel did not do anything she said she would do and was negligent in advising Petitioner on proper affidavits and notarization. (*Id.*). Petitioner attached numerous communications with

---

[4] Petitioner moved for leave to have his second PLA (Dkt. 41-12) considered as his reply in support of his habeas corpus petition, which this Court granted. (*See* Dkt. 51).

counsel as exhibit A-2, presumably in support of his ineffective assistance claim. (*Id.*). The Illinois Supreme Court again denied the PLA. (State Ct. R., Ex. M, Dkt. 41-13).

### D. Federal Habeas Corpus Proceedings

Petitioner first filed a petition for a writ of habeas corpus in the Northern District of Illinois in 2010, which was dismissed without prejudice and with leave to reinstate following the termination of his state court proceedings. *See Carnalla v. Gaetz et al.*, Case No. 1:10-cv-05073 (Conlon, J.). While Petitioner filed a letter in 2020 seeking to reinstate that petition (*see* Dkt. 6), the case was never reopened. Petitioner's letter indicates that his habeas petition was "renewed" in the Southern District of Illinois under case number 3:20-cv-00878. (*Id.*). Indeed, in August 2020, Petitioner filed a petition for a writ of habeas corpus in the Southern District of Illinois which was assigned to Judge Yandle under case number 3:20-cv-00878. In July 2021, Judge Yandle denied Petitioner's motion to transfer the case to the Northern District of Illinois and dismissed the case with prejudice because it was brought under the wrong statute. (*See* Dkt. 8). Petitioner appealed the dismissal (*see* Dkt. 10), and the appeal is still pending. (*See Carnalla-Ruiz v. Brookhart*, Case No. 21-2569 (7th Cir.)).

The instant petition (which the Court notes was brought under the correct statute) was filed on October 27, 2021 (Dkt. 4) and stayed pending completion of Petitioner's postconviction proceedings (Dkt. 3). On October 6, 2023, this Court lifted the stay after Petitioner had exhausted his state court remedies. (Dkt. 39). Petitioner now raises four claims: (1) Petitioner was subjected to a warrantless arrest, his criminal complaint was unsigned, and the arresting police officer "admitted in court no 'offense' was committed in his presence nor had knowledge an offense was going to be committed;" (2) violation of due process during pre-trial and trial; (3) violation of due process during direct appeal and ineffective counsel; and (4) violation of due process during post-

conviction petition and ineffective counsel. (Pet. at 5-6, Dkt. 4).[5] This matter is fully briefed and ripe for ruling.

## ANALYSIS

Respondent argues that the Court should deny this habeas petition because the claims Petitioner raises are procedurally defaulted, as Petitioner "failed to present them in one round of state court review." (Ans. at 265, Dkt. 40). Alternatively, even if the Court was to construe certain of Petitioner's claims as having been exhausted during state court review (i.e. *corpus delicti* and ineffective assistance of counsel), Petitioner is still not entitled to habeas relief on those claims. (*Id.* at 266-267). The Court agrees on both points.

Prior to seeking review from a federal court through a habeas corpus petition, petitioners must present their claims for state court review. "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Illinois, a complete round of appellate review includes (1) review by the appellate court, followed by (2) seeking review by the Illinois Supreme Court by way of a petition for leave to appeal. The same process applies for a postconviction petition for relief. But simply engaging in one complete round of review may be insufficient for purposes of federal review if the petitioner failed to raise the ***same*** claims—factually and legally—at each stage of review. *See, e.g.*, *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) ("Adequate presentation of a claim requires a petitioner to 'present both the operative facts and the legal principles that control each claim to the state

---

[5] Unless otherwise noted, page numbers in citations to the docket reference "PageID #" in the CM/ECF header of the filing, not other page numbers in the header or footer of the document.

judiciary.'") (citation omitted). For example, "the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default." *Id.*

Here, Petitioner completed two rounds of review before the Illinois courts—he sought review from the appellate court and then filed a PLA with the Illinois Supreme Court during both his direct appeal and postconviction proceedings. Even so, the rub lies in the claims that Petitioner raised at each stage of review compared to the claims he tries to raise before this Court now. A close analysis of Petitioner's claims at each stage of review demonstrates that most of his claims are procedurally defaulted, and the ones that are not fail to state a ground for federal habeas relief.

## I.  <u>First Claim</u>

Petitioner's first claim before this Court challenges his arrest, the unsigned complaint, admissions by the arresting police officer that no offense was committed, the trial judge erroneously shifting the burden of proof on Petitioner's motion to quash his arrest and suppress his confession, and the Cook County public defender's refusal to provide Petitioner with his common law record. (Pet. at 5). Petitioner failed to raise any of these claims in one full round of state court review. Indeed, with respect to all but the last two points, Petitioner never presented arguments during state court review on any of those contentions. While Petitioner did contend that the trial court erred in his first PLA, he did not present that specific claim in his direct appeal, nor did he raise it at any time during his postconviction proceedings. Similarly, Petitioner raised issues about his records only in his second PLA. Because Petitioner failed to raise any of these issues during one complete round of state court review, his first claim is procedurally defaulted and cannot be considered by this Court.

10

## II.     Second Claim

Next, Petitioner contends that his due process rights were violated both before and during his trial. (Pet. at 5). Specifically, he argues that the jury instructions were erroneous, the "prosecution did not present proof that physical or psychological injury occur[ed]," his credibility was attacked because of his immigration status, and the jury could not have been impartial. (*Id.*). In his postconviction petition, Petitioner argued that his counsel was ineffective for failing to raise the fact that the jury instructions were erroneous but notably omitted any claim that the jury instructions were in fact erroneous. Petitioner has never claimed, until now, that his credibility was attacked due to his immigration status, and he did not raise a claim of jury impartiality until his second PLA. Thus, this claim cannot proceed on any of these grounds.

This leaves only Petitioner's contention that the prosecution failed to present proof that an injury occurred, which this Court interprets as a *corpus delicti* argument. And while Petitioner did arguably raise his *corpus delicti* claim through one complete round of state court review, that does not help him here. Habeas relief is available only for alleged violations of federal law; however, to analyze a *corpus delicti* claim would require this court to review state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Curtis v. Montgomery*, 552 F.3d 578, 581 (7th Cir. 2009) ("A petitioner is entitled to a writ of habeas corpus if . . . a state court unreasonably applies clearly established federal law[.]"); *Johnson v. Williams*, No. 14 C 4196, 2015 WL 2452828, at *6 (N.D. Ill. May 20, 2015) (holding that "Illinois' corpus delicti rule is not required by the United States Constitution" and so a *corpus delicti* claim is not a cognizable ground for federal habeas relief as it would require

11

interpretation of Illinois law). Therefore, Petitioner is not entitled to federal habeas relief on his *corpus delicti* claim.

III.     **Third Claim**

Petitioner's third claim is that his due process rights were violated during his direct appeal because his counsel was ineffective. (Pet. at 6). Namely, Petitioner argues that his appellate counsel "neglected to raise the number of times the alleged victim denied the arguments at issue" and made a motion Petitioner disagreed with. (*Id.*). He also re-asserts his *corpus delicti* claim. (*Id.*). As discussed *supra*, Petitioner is not entitled to relief on any *corpus delicti* claim from this Court. And in terms of his ineffective assistance of counsel arguments, Petitioner never raised either issue during the state court proceedings. Although Petitioner generally raised ineffective assistance of counsel claims, they were factually distinct from the claims he tries to raise now. Thus, they too are procedurally defaulted.

IV.     **Fourth Claim**

Finally, Petitioner's last claim is for a violation of due process during his postconviction petition because his counsel was ineffective. (Pet. at 6). In support, Petitioner contends he requested emergency medical relief for an ear injury which resulted in him being harassed inside IDOC and the court purposely delaying ruling on his case, using the COVID-19 pandemic as "pretext" for the delay. (*Id.*). He also repeats that most of "the common law record" has not been furnished to him. Presumably, Petitioner is contending that counsel was ineffective in failing to act on his request for medical relief (resulting in subsequent alleged due process violations) and provide him case records. But Petitioner is not entitled to relief on this claim as "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C.

12

§ 2254(i). And even if the Court considered the claim on the basis of the supporting facts without the allegation about counsel's purported ineffectiveness, Petitioner failed to raise facts about any alleged medical condition, harassment inside the IDOC, and receipt of his records until his second PLA and never raised claims about the court purposefully delaying his case, so that claim is also procedurally defaulted.

## CERTIFICATE OF APPEALABILITY AND NOTICE OF APPEAL RIGHTS

A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). An applicant makes such a "substantial showing" by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that, because of the adequacy of the issues presented, the petitioner deserves encouragement to appeal. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citations and quotations omitted). The Court concludes that Petitioner cannot make such a substantial showing and thus declines to issue a certificate of appealability.

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a

13

reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## **CONCLUSION**

For all the foregoing reasons, Petitioner's habeas corpus petition [4] is denied and the Court declines to issue a certificate of appealability. The Clerk is directed to update the docket to reflect that the Respondent is Christel Crow, Warden, Big Muddy River Correctional Center and alter the case caption to *Carnalla-Ruiz v. Crow*. All pending motions and deadlines are terminated as moot. Civil case terminated.

**DATED**: August 21, 2025                    ENTERED:

  /s/ LaShonda A. Hunt
_____
LASHONDA A. HUNT
United States District Judge